LYNN'S ADM'R
*vs*
SISK.

---

# Lynn's Administrator *vs* Sisk.

## ERROR TO THE HOPKINS CIRCUIT.

*Executions. Revivor. Sci. fa. Sheriffs.*

CHIEF JUSTICE MARSHALL delivered the opinion of the Court.

CASE.

*Case 44.*

January 16.

THIS was an action on the case against Lynn, for making an excessive levy and sale on an execution in his hands, and for converting the proceeds of the sale to his own use. The defendant pleaded not guilty and died before trial. A *scire facias* was thereupon issued to revive the suit against his administrator, and a demurrer to the *scire facias* having been overruled, the first question presented for our consideration in revising the judgment afterwards rendered against the administrator, is whether this action could be revived.

By the ancient common law in cases of injury to the person or to personal or real property, where the action must be for the tort and in form *ex delicto*, and the plea would be not guilty, if either party died, no action could be supported by or against the representatives of either. The statute of 4 *Ed.* 3 *ch.* 7, by the construction placed upon it, changed this rule only so far as to allow the representative of the party injured to sue for any injury to the personal property of the decedent, whereby it had been rendered less beneficial to the executor: (I *Chitty's Pleadings,* 78–80, *and* 102–104.)

But by the 55th section of the general act passed by the Legislature of this State in 1797, "to reduce into one the several acts concerning wills, the distribution of intestate's estates and the duty of executors and ad-

Case stated.

By the ancient common law, no action for *tort* in form *ex delicto* where the plea was *not guilty,* where either party died, could be revived. This was changed by the construction put upon the statute, (4 *Edward,* 3)—so far as to allow the representative of the party injured to sue for an injury to personal property of the decedent. (1 *Chitty,* 78–80 & 102–104.) And by the statute of Ky. of 1797,

(*Stat. Law* 670,) actions of trespass are given by or against executors or administrators for goods taken or carried away in the lifetime of the testator. The statute of 1801, (*Stat. Law*, 86,) provides, that in case either party to an action die after the service of the writ the action shall not abate, if it were originally maintained by or against the executors of the decedent, but may be revived by *sci. fa.*

ministrators," (1 *Stat. Law*, 670,) actions of trespass are allowed by or against executors or administrators, for any goods taken or carried away in the lifetime of the testator or intestate. And an act of 1801, (1 *Stat. Law*, 86,) provides that in case either party to an action die after service of the writ, the action shall not thereby abate, if it were originally maintainable by or against the executors of such deceased party, and that in such case it may be revived by *scire facias*. The section of the act of 1797, above quoted, was no doubt intended as a re-enactment of the statute of 4 *Ed.* 3, and as an extension of its provision, by making it applicable to the executor of the wrong doer, as well as to those of the party injured; an omission in the English statute which has only been supplied by a very recent act of Parliament. This Court, in the case of *Kennedy, &c.* vs *McAfee's executors*, (1 *Littell*, 169,) regard the act of 1797, as a re-enactment of that of 4 *Ed.* 3, and refer to the construction given to the English statute, to show that ours was not intended to give remedy to or against executors or administrators, for injuries done to real estate in the lifetime of the testator or intestate. A reference to the same source for a construction of our act in regard to the nature of the injuries for which remedy is given to or against executors, and the nature of the remedy, authorizes the conclusion that our statute did not intend to confine the remedy which it provides, either to cases of actual trespass *vi et armis*, committed by or against the deceased, or to the form of trespass *vi et armis*. And as in the statute of *Ed.* 3, the word trespass was held to have been used in its general sense of wrong or injury, and the case of taking and carrying away goods, to have been put by way of example only, and as, therefore, that statute was construed as giving appropriate remedy for all injuries to the personal property of the decedent, whereby it was rendered less beneficial to his executor, so in our statute the "actions of trespass" authorized to be maintained by or against executors, should at least be understood as embracing all actions coming under the general name of trespass—as trespass on the case and trover, and the

case put of taking and carrying away goods, should be understood as excluding injuries to the person and to real estate only, and as embracing or indicating all injuries to personal property, remediable by action of tort between the original parties. And as the statute of *Edw.* 3, was construed as giving remedy to the executor for such injuries, as a false return made, or an escape suffered by a Sheriff, or for negligence by his attorney, committed in the lifetime of the testator, our statute should also be construed as giving remedy for similar injuries, not only to the executors of the party injured, but against the executors of the wrong doer.

That such was understood by the Court which decided the case referred to in 1 *Littell,* to be the true construction and operation of the act, may be implied from the opinion given in that case. And that it has been the commonly received construction, is manifest from the fact that the act of 1842, (3 *Stat. Law,* 573,) while it gives remedy to and against executors for injuries to real estate, committed in the lifetime of their testators, is silent as to any remedy for injuries to personal property, an omission to be accounted for only upon the supposition that it was then understood that ample remedy was already given by previous laws. And although the act of 1812, (*Stat. Law,* 88,) might be construed as giving an action against executors for such injuries, yet as the construction given to it in the case already referred to, seems to confine it to personal injuries, and leaves it at least doubtful, whether it should be understood as embracing injuries to personal property, there was no other act but that of 1797, which could, with reasonable certainty, be regarded as giving remedy for a mere tort, after the death of the wrong doer.

It is sufficient, however, that such remedy exists against the executor of the wrong doer, and whether it is given by the act of 1797 or by that of 1812, the act of 1801 applies to the action brought against the wrong doer, and authorizes its revival by *scire facias,* in case of his death after service of the writ upon him. There was no error, therefore, in overruling the demurrer to the *scire facias* and reviving the present action.

*Margin notes:*

Lynn's Adm'r vs Sisk.

The statutes did not embrace injuries to the person or to the realty until 1842. (3 Stat. Law, 573.)

Before proceeding to consider the opinions of the Court given in the progress of the trial, we remark that the principal basis of the present action, is the alleged excessive levy, and that although if that be established, the plaintiff might recover for the value of his property unnecessarily sold and not paid over to him, or otherwise lawfully disposed of by the officer, yet if the excessive levy be not established, there could be no recovery for the sacrifice of property at the sale, because there is no averment of any improper act or omission of the officer, which could make him liable therefor, except the excess of the levy. And we think it entirely clear that a levy cannot be deemed excessive, if upon a sale fairly made, either with the consent of the debtor or without the omission of any of the steps prescribed by law, it appears that the debt authorized to be made by the sale, is not in fact satisfied until all the property levied on is sold; and the excess of the proceeds finally produced, cannot be evidence of an excessive levy for which the officer could be made liable, unless by pursuing a different order in making the sale, less property would have been sufficient, and unless the officer is blameable for not pursuing that order.

In this case the plaintiff read the execution referred to in the declaration, with the return thereon, which stated that on the 11th of April, 1845, it had been levied, with others which are named, on a negro woman, Edy and her child, that having duly advertised, &c., he sold them on the 22d of April, after first selling at the defendant's request, various specified articles of personal property, which did not produce enough to satisfy the execution, and that $44 02 of the proceeds were paid to the Sheriff of the county, who had levied an execution, &c. The execution on which this return was made, was for upwards of $60, including interest, &c. The personal property sold for $35 77½, the woman and child for $301; and the schedule annexed to the execution, states the four other executions against the same defendants and the amount of each, and shows a balance in the Constable's hands, of $130 79½, after all deductions. The plaintiff then introduced a witness

who proved that at the joint request of plaintiff and the Constable, Lynn, he had himself bid for and bought the personal property referred to, that he considered himself as buying it for the present plaintiff, and had never removed it; and that it was worth five times as much as he gave for it, and the evidence conduced to show that Edy and her child were sold considerably below their value. It was further proved on the part of the plaintiff, that Lynn, the Constable, was not in the county on the 11th of April, when his return stated the levy on the negro woman and child to have been made. It was proved that Lynn had some months before this sale, paid some of the plaintiffs in the executions, the whole or a part of the money due them, but whether he had received it from Sisk, or advanced it for him, is left to inference. The defendant then read the several executions referred to in the schedule read by the plaintiff, with the returns thereon, each of which stated a levy on the woman and child as having been made on the 11th of April, and in all other respects agreed with the return read by the plaintiff. He then asked a witness introduced by him, whether he, the witness, was not in April, 1845, a Constable of the county, (Hopkins;) whether Lynn, on leaving home, had not placed the foregoing executions in his hands; whether he had not levied them on the negro woman, Edy, and her child, on the 11th of April, 1845, and on Lynn's return handed the executions and the slaves over to him, Lynn, to complete the action on them. To the answering of these questions, and every part of them, the plaintiff objected, and the Court sustained the objection. But the witness stated that about ten days before the sale, he saw the two negroes and all of the foregoing executions in the hands of Lynn.

The rejection of the offered testimony, could only be sustained on the ground of its entire irrelevancy, which could not be, unless the levy by the witness should be deemed wholly unavailing to Lynn, or unless though authorising the sale for the satisfaction of the executions thus levied, they were entirely unnecessary and immaterial to the defence of Lynn, in regard to the levy and

sale alleged in the declaration, as upon the facts there appeared to be no culpable excess. It is not necessary to consider the latter proposition further, than to say, that the facts are not of such a character as should preclude a full development of all circumstances tending to show the propriety of the levy on the woman and child. And as it is manifest, from other opinions of the Court, that the evidence was rejected because the acts referred to as having been done by the witness, were supposed to be unavailing, we are called upon to decide the question presented in that proposition.

As the executions were directed to any Constable of Hopkins county; we have no doubt, that although they came first to the hands of Lynn, any other Constable of the county to whom he might deliver them, was authorized by the direct mandate of the writs, to levy and sell, having the executions in his hands. And although it would have been proper, we cannot say that it would have been indispensable to the validity of these acts, that he should have noted on the executions, the fact and date of their delivery to him. Nor do we suppose that the command and authority to sell, is any more limited to the Constable who makes the levy, than the authority to make the levy is restricted to the Constable who first receives the execution—it is still a command to any Constable of the county, to make the debt. And even after a levy by one Constable, another to whom he delivers the execution and the property seized under it, may proceed as the first might have done. Then there is no question that on receiving the executions from Lynn, the witness had authority to levy them, and that upon the delivery of the executions with the property seized by Lynn, he had authority to finish the execution by selling the property. And the only question is, whether as the returns on the executions import a levy by Lynn, and there is no mention of the delivery to the witness, nor of the levy and re-delivery by him, Lynn, is precluded from proving these facts in explanation of the fact proved by the plaintiff, that he himself was absent from the county on the 11th of April, and could not have made the levy on that day.

*Executions directed to any Constable of the county may be received by one and handed over to another to be executed, or if levied, to sell, &c.*

We are of opinion that the only conclusive effect of the return, is to make Lynn responsible for the levy, though made by another, whose acts are adopted by reporting them as if done by himself. And although we might not conclude that a Constable may authorize whom he will to levy an execution, and make the act valid by adopting it, we are of opinion that he may authorize or allow another Constable to make the levy for him, and adopt and report the act as his own, because such other Constable, with the execution in his hands, is doing no more in making the levy than the execution and the law empower him to do. We are also of opinion that Lynn was not concluded by his return as to the day on which the levy was made, and therefore that the fact that he was absent from the county on that day, did not prove conclusively, (as was erroneously assumed in the instructions given to the jury,) that there was no levy which authorized the sale, even in the absence of the testimony offered to prove that the levy was made by another Constable for him in his absence. He might have levied on the 12th, in time for a sale on the 22d; and a mistake in stating the levy to have been on the 11th, would not have vitiated the sale, and should not prejudice him. He had a right to explain the fact, whether there was a mistake of date, or a levy by another Constable for him. And therefore the testimony offered on this subject was improperly rejected.

It was also erroneous to reject the testimony offered to prove that the Sheriff had levied an execution on the woman Edy and her child, which entitled him to a part of the proceeds of sale paid over to him. The testimony offered to prove that the entire residue of the proceeds of the sale remaining in the hands of Lynn, after satisfying the execution claims upon it, was attached in his hands under a restraining order properly issued, which enjoined him from paying it to the plaintiff, was also improperly rejected. Even if the levy were excessive and the sale at a sacrifice; and if more property was sold than was necessary, so far as the proceeds were properly appropriated to the executions levied, or were withheld from the plaintiff by compul-

A Constable selling property upon which a Sheriff has previously levied may properly pay off the Sheriff's lien in virtue of his levy, when he sells.

sory process, there could be no recovery of them in this action, any more than if they had been actually paid to and received by the present plaintiff.

The first instruction given on behalf of the plaintiff, is misleading and erroneous, inasmuch as it seems to authorize a conclusion that the levy was excessive, and the plaintiff entitled to recover therefor, without any reference to the sale actually made as a criterion. The second is erroneous in assuming that if Lynn was out of the county on the 11th of April, when his return states the levy to have been made, he could not have made the levy as returned, and the sale was illegal, and such pretended levy furnished no defence. The third instruction, in connection with the first and second, is misleading, in assuming that if the jury found that the sale of the personalty was sufficient to satisfy the execution named in the declaration, the sale of the slaves was illegal, unless the other executions had been levied, when the first instruction had excluded the actual result of the sale as a criterion of sufficiency, and the second had told the jury that if Lynn was absent from the county on the 11th of April, those other executions did not justify the sale.

The first instruction asked for by the defendant, to the effect that the mother, Edy and her infant child, should not have been separated in the levy and sale, was erroneously refused.

The second was properly refused, because if there was personal property subject to levy certainly sufficient to satisfy the executions, and known to Lynn, the levy on the slaves, unless assented to, was excessive, as well as otherwise illegal, and therefore the sixth instruction of the defendant was also properly overruled. The third instruction was properly refused, because if the levy and sale were excessive, the plaintiff may recover in this action the excess in the proceeds, so far as not properly applied. And as upon the same assumption, he might recover for the sacrifice in the sale, though it was legally conducted, the fourth instruction was properly overruled.

The fifth instruction, to the effect that if the person-

al property given up by Sisk did not sell for enough to satisfy the execution named in the declaration, it was the duty of Lynn to sell the slaves, is so far correct, as the Court had a right to assume, upon the evidence, that the sacrifice in that sale was not attributable to any fault in Lynn. But it goes on to say, that in that event, even if the other executions were invalid or paid off, and Lynn by mistake applied a part of the price to other debts, this would not render him liable in this suit. We think this latter proposition is incorrect, because, although this action is not brought exclusively for misappropriation of the proceeds of the sale, the charge that they were converted to the defendant's use, is in itself a cause of action, which if proved, authorizes a recovery. And we cannot say that this charge in the declaration is so entirely consequential, that upon failure to prove an excessive levy, the plaintiff could not recover for a conversion of the proceeds of the sale, which is established by even a mistaken appropriation of them to debts already paid, and especially if actually paid by Lynn himself. The instruction as asked, was therefore properly refused.

But for the errors before indicated, the judgment is reversed, and the cause remanded for a new trial in conformity with this opinion.

*J. H. McHenry and J. & W. L. Harlan* for appellant.

There could be no excessive levy where the property failed to bring the amount of the debt without any unfairness in the Sheriff.